There's multiple sharing involved and the courtroom deputy will put separate clocks when you come up that will help you track your time a little more easily so the ones who aren't arguing don't get too nervous about having your co-counsel take up your time. Good morning, your honors. May it please the court, my name is Ernest Galvan. I represent the plaintiff and appellate, Ingrid Tischer, and the four organizational plaintiffs. I would like to reserve four minutes for rebuttal. The district court erred in granting the motion to dismiss without leave to amend. Twenty-eight years ago this court faced a physician-assisted suicide case, Lee v. Oregon. That was a pre-enforcement challenge to the nation's first law. And the court turned away that challenge on standing grounds because pre-enforcement no one could say. Counsel, you mentioned standing so let's start there. You know that the Arizona Alliance has been called on bonk. Should we hold off until that case is decided? No, your honor, that's not necessary because for our organizations they meet standing under the Alliance for Hippocratic Medicine or Hippocratic Alliance. Well, but hold on. Didn't that case, didn't Arizona Alliance modify or interpret that particular case? It did interpret that case, but I think the teaching of the Hippocratic Alliance case is that an organization must show an injury to its core business activities. Well, let's set aside its teaching for a second because isn't Arizona Alliance going to tell us what the new teaching is on this issue of organizational? If our organization's standing were a close case, if we were sort of on the margin between just pure frustration of mission and diversion of resources, which were the standards that the Mays case, the Arizona Alliance of Retirees said is no good after Hippocratic Alliance. If we were a borderline case, then possibly yes, the court should wait, but we're not a borderline case. We're in the heartland of injury to core business activities. For example, communities actively living independent and free, the Independent Living Center, its core business activity is to help people with severe disabilities overcome the desire that they may feel to end it all and to see that you can live a full life in the community despite your disabilities. And the state's regime of assisted suicide, of creating this model where the state endorses just killing yourself, that directly injures that core business activity for communities actively living. Same with United Spinal, whose core activity for its entire existence has been to help people, especially people with recent severe spinal injuries, get over the shock and depression and see how they can still live. So this is not a borderline case where the organizations spent money on the issue, on issue advocacy, because they were offended on moral grounds. This is a case where their core business activities are put at risk and directly harmed. And so since we're in the heartland of what the Supreme Court said organizational standing now means, it's not necessary to look at the borderline situation that I think the Arizona retirees case. If we were to hold the case in abeyance in light of Arizona Alliance, what would that do to your individual plaintiff? Assuming we've thought that she had adequately alleged standing. Is there any way to kind of bifurcate the case? I don't think it's necessary to bifurcate the case. If the case were to go back to the district court on the grounds that Ms. Tischer has standing, then Ms. Tischer's interests can be litigated in the district court. But how are we going to do that if the case is being held in abeyance while the en banc court considers the question of the organizational standing? In light of her circumstances, I mean, one of the plaintiffs in this case has already passed away, correct? That is correct, Your Honor. That problem could be addressed by supplementation of the pleadings under Rule 15 to add additionally similarly situated individual plaintiffs. These were filed as two separate cases. No, Your Honor, this was filed as one case. What about the other way? If we find that the individual plaintiff doesn't have standing, does that change your position on whether it should be held for the organizations? No, Your Honor, because we believe the district court was correct in finding that the organizations have standing. And so we believe the district court should be affirmed on that point, that the organizations had standing. And then the case can go forward. With regards to the plaintiff tissue, though, was she diagnosed with a terminal disease? The plaintiff tissue, well, that gets into a question, Your Honor, and the answer I'm going to say is no. She's never had a doctor say, oh, my gosh, you're terminal. However, this is the problem with the statute that we're challenging is that terminalness or being terminal is an elastic concept under the statute. And that's why we have people in this country now getting physician-assisted suicide for anorexia, for example. And if you simply stop treatment for anorexia, stop eating, stop hydration, you're going to be terminal within five days to three weeks. So she indicates that she can use the BiPAP machine, as I understand. Is that correct? That is correct, Your Honor. And has she any plans on not using that? Is that the notion, how she would then become terminal? No. She has no plans in not using that. But she has experienced, as people do, the doubt that comes from living with a disability in a system where you're constantly getting the message that you'd be better off dead. She described her medical encounters where she needed, after a hospitalization, she needed rehab. And a neurologist said, look, death is really what's coming, and I'm denying your referral for rehab. When those things happen to people like Ms. Tischer, they are at serious risk of stopping treatment, making themselves terminal, which is extremely easy to do under the statute. So the notion of her being terminal is that others are saying to her that she needs to proceed with suicide. It's not just others. It's the defendants in this case. The state, by enacting this regime, is saying that to her. And does she have any other medical support services that she uses to sustain her condition? She has a variety of conditions, yes, which require more than the BiPAP machine. She is vulnerable to infections and so needs occasional treatment for those sorts of things. So people in Ms. Tischer's situation do depend on a variety of medical interventions to stay non-terminal, to stay alive. That are life-sustaining. That are life-sustaining, yes. Thank you. Yes? If you can expand a little more on your argument that the statute, on its face, steers individuals towards one path of assisted suicide versus the other. You're saying the statute does that?  Our challenge is a facial challenge. And how does the statute do that? The statute does that by creating two tiers of suicide prevention in the state of California. The one tier for the people without terminal disabilities says that when a medical professional provider hears suicidal ideation, that person is supposed to respond with life-sustaining interventions. They're supposed to help prevent a suicide. The second track, the inferior track, which is created for people with terminal illnesses, all of whom are persons with disabilities, no one disputes that. The second track says that the state-sanctioned response to suicidal ideation should be to give the person poison. And so that is how it facially discriminates against people with disabilities. There is a second way in which the statute does harm facially, which is that it not only is pushing people toward death, it's pushing people to an inferior system of medical care. Note how the statute immunizes the decisions that the physician has to make regarding providing the lethal medication. The statute says that no sanction can be taken, no licensing discipline, no civil liability. The statute removes the provision of medical care regarding physician-assisted suicide from the ordinary standards of medical regulation. That's an inferior system to which only persons with disabilities are consigned, and that is facial on the statute. The other thing I'll say about the facial nature of the statute and the difference between where we are now and where this court was in 1997 in Lee is that this is a post-enforcement challenge. In Lee, we knew nothing about how the statute would actually work. It's now almost 30 years later, and our complaint is replete with facts regarding the way these statutes work. Well, and that was one of the questions I had about the individual plaintiff. I mean, hasn't she adequately alleged a violation of the ADA? I mean, her challenge to the ADA or her ADA claim is not a facial challenge to the statute, is it? It's just that the scheme that the California law has created has led to defendants discriminating against me in violation of the ADA. Am I misunderstanding that? That's her allegation of the injury that gives her Article III standing. But I think her challenge to the statute remains a facial one in that it's not a particular application of the statute. It's not some particular feature. It's not the waiting period. It's not the specific standard for a mental health referral. It's the entire scheme that injures her in her day-to-day encounters with the medical care system. And so I believe it is still a facial challenge. But it's a facial challenge that, if the case goes forward, is going to be informed by 28 or, in California, 10 years of history on how the statute has been implemented. For example, the district court erred by saying that, as a matter of law, terminal illness will be diagnosed with regard to the life-sustaining possibilities of ongoing treatment. But the statute nowhere says that. The statute simply says terminal illness is diagnosed within reasonable medical judgment if you're going to be terminal within six months. If the case goes forward, we will demonstrate that doctors under these schemes all over the country are accepting or making terminal diagnoses when the patient stops treatment and makes themselves terminal. Or in the case of anorexics, when they just decide, stop eating, stop getting hydration. That is how the statute actually works. The district court erred by engaging in construction of the statute, adding words to it that aren't there. Counselor, are you arguing, just because I want to make sure I understand this, are you arguing that on the substantive due process claim, are you arguing that people have a fundamental right to suicide prevention? People have a fundamental right to life, life, liberty. But do they have a fundamental right to suicide prevention is what my question is. They have a fundamental right to be free of state action that encourages suicide. So do they have a fundamental right to suicide prevention? That depends on the circumstances. I mean, then we would get into the Descheny. Under some circumstances, you believe, yes. Certainly, they have a fundamental right to be free from a state-created danger that increases their risk of suicide. That's an exception to the Descheny doctrine that you don't have a particular right to government protective services, except when you have a special relationship or the state acts in a way that creates the danger or increases an already existing danger. Counsel, I wanted to remind you you're down to a minute and 40-some seconds. Do you want to save your time for rebuttal? Yes, Your Honor. Thank you.  Good morning, Your Honors, and may it please the Court. My name is John Capos of O'Melveny & Myers, and I represent the proposed interveners in this case. That would be Compassion and Choices Action Network. Doctors Banerjee and Dr. Forrest, who treat disabled and terminally ill patients, and three disabled California citizens, Burt Passler, Judith Coburn, and Peter Sussman. Now, this case was filed by UnitedSpinal in April of 2023, and we moved to intervene in September of 2023. In February of 2024, we asked the court, the lower court, the trial court, for a decision on that motion, to which we did not hear back until March 27th, when the trial court granted defendants' motion to dismiss. And in that decision, in one sentence at the end, they denied our motion to intervene as moot. We then moved for reconsideration in April, and in May, the trial court denied that motion for reconsideration on the basis that interveners should have noted in their intervention motion that they wished to participate in the appeal, which was the argument that we made in our motion for reconsideration. We submit that this is slight of hand and was an error for the trial court to essentially suggest that our motion to intervene should have foreseen that there would be a motion to dismiss in the future that would be granted and that we would need to, at that time, six months earlier, have made a request to participate in the appeal. But how are you injured by the court's ruling? We have been unable to participate as a party in the appeal, which is the injury here. We think it is very important, and we've briefed this in our intervention papers, that we have met, we believe, the standard for both intervention as a right and for permissive intervention. And what we're going to talk about next is the appeal. And you moved to intervene in the appeal in the Ninth Circuit. A panel denied the request? That's correct. We believe because the Ninth Circuit felt that they would address the issue in the appeal that was styled with the number 2755. So we, as a protective measure, we filed a motion to intervene in the 2551, which was denied. Justice Carnoto, you're correct. So that was, we believe, the first error was for the court to engage in this sort of, you know, you should have been clairvoyant and six months before predicted that there would be an appeal that you wanted to participate in. We think it's also error to have declared our motion to intervene moot on the basis that the motion to dismiss was granted. This court has held, both in the Canatella opinion and in the allied concrete, that the typical rule as an appeal is moot if there exists no present controversy as to which effective relief can be granted. That is clearly not the case here. There is a present dispute. That's why we're all here today. And so we submit that the mootness finding was an error as well. And then let me just briefly touch on the- Yes, if you can wrap it up, counsel. You're actually over time. Okay. On the motion to intervene, as we've indicated in our papers, there's clearly, I don't think it's even contested that there's a significant protectable interest that the interveners have. It's not contested that that protectable interest can be interfered with by a ruling from this case. There is an issue about timeliness, and we think we've met that standard because we filed before anybody had answered the complaint and before any substantive engagement by the trial court had happened. And as to the final factor, adequacy of representation, we've briefed in detail why we believe that the state's lawyers are doing a fine job, but their interests are a little bit different than the interests of disabled California citizens. We think we have a perspective that the trial court should hear and that our motion to intervene should be granted. I think we've got a handle on your arguments, counsel. Thank you, Your Honors. Thank you very much for your participation. May I proceed, Your Honors? Please. May it please the court, James Jardine for the County of Los Angeles and the Los Angeles County District Attorney. I'm going to be very brief. I understand we're very pressed for time here. The only thing I really wanted to address was to point out something that was lacking in the appellant's opening remarks, and that's any reference to the role of the prosecutor with respect to any of their challenges. Now, they've raised claims against us, but I think that their failure to address us in any meaningful fashion highlights the fact that we did not play an integral role in the establishment of this scheme in any fashion. The district attorney is simply following current California law, which forbids these particular prosecutions that was enacted by the legislature. The district attorney abides by it, and there is no allegation of any facts suggesting that the district attorney or the County of Los Angeles played any role in seeking to establish this scheme, and we are really an unnecessary party here. If the court determines that the facial challenge is valid and the law is strict, then the district attorney will abide by that change in law and proceed accordingly. And so I really don't have anything beyond that, Your Honors. If you have any questions for me, I'd be happy to answer them, but I know Ms. Butterick is really going to dive into the merits, and I'm sure that's what you're more interested in hearing. Any questions? No. Thank you, Counsel. Thank you, Your Honors. Good morning, Your Honors. Deputy Attorney General Jessica Butterick for the State Defendants. Good morning. Good morning. I'm sure you're anticipating we're going to ask you about Arizona Alliance and whether this needs to be stayed for the en banc ruling to come out. Your Honor, we agree with appellants that this case fits squarely within Hippocratic medicine, such that this court does not need to wait for Arizona Alliance. Nevertheless, if the standing question is too unsettled, it would be perfectly appropriate for this court to affirm on the merits without reaching the question of standing. It would not, however, be appropriate for this court to reverse on the merits without reaching the question of standing. So it would also be fine. I guess we're asking that question, we wonder, because the now vacated three-judge opinion in Arizona Alliance, as you know, was very critical of the court's precedence prior to the Supreme Court's ruling, and the way that the standing allegations were briefed talked a lot about the diversion of resources and that they'd have to kind of like shift course in order to address the statute. So I think what the panel's thinking about is whether the framework will be reset again, the impact of Hippocratic Oath on the existing precedent in the Ninth Circuit, which, as I'm sure you're familiar, has been longstanding, as the dissent, the original dissent pointed out. And that may affect the analysis. Yes, Your Honor. We think that Arizona Alliance is a much more difficult case than this one, and that we win on standing even under the dissent in Mays. Under a square focus on Hippocratic medicine, this case is virtually indistinguishable. In Hippocratic medicine, you had organizations who were opposed to abortion, who had to divert resources to educational efforts and studies to convince people not to get abortions after abortion medication became easier to obtain. In this case, plaintiffs allege that the Act has made it easier to obtain the aid in dying medication. And so they have had to divert resources to persuade their members not to use aid in dying medication. In that way, the educational efforts and the advocacy efforts are really the same as Hippocratic medicine. And it's for that reason that we didn't focus on Mays in our brief, other than in a brief footnote to acknowledge that we knew it existed, because the facts in Mays really are much more difficult than the facts here. And plaintiffs have not demonstrated any way that they could amend their complaint to add additional facts or additional allegations. To the contrary, their position is that they've stated their case as strongly as they need to. Even if the court—I'm sorry, Your Honor, did you have— Could you address the individual standing issue with Ms. Tischer? Does she have standing how— No, Your Honor, she doesn't. Ms. Tischer's theory of injury is that if she were to voluntarily stop using her BiPAP machine, that she would ultimately become terminal. But those facts, as alleged, are not sufficient to establish eligibility under the Act. She hasn't been diagnosed with a terminal illness. And there's no reason to believe that she will stop using her machine. In addition to she stop using the machine, she hasn't alleged that she would imminently suffer from an incurable and irreversible— I think she indicated that it would take six months, I think, of her not using the machine, is what I believe the record reflects. The problem, Your Honor, is that patients can't volunteer or opt in to being terminally ill. The disease has to be irreversible and incurable, and a reasonable medical professional has to determine that— well, a medical professional has to determine that within reasonable medical certainty that the illness will be terminal within six months. So if we have to hold off to decide the issue of organizational standing with regards to Arizona Alliance, should we do the same with regards to Ms. Tischer? Should we just hold off on the whole thing? Yes, Your Honor, because this is a facial challenge to the statute. Although in the reply brief, plaintiffs averred that they might be able to bring in as-applied challenge, they seem to have disavowed that here today and made clear that this really is a facial challenge to the scheme, in addition to which there are no allegations about— Well, if they made that argument, they abandoned those when they stood at this podium and said something to the opposite of that. That is our view as well, Your Honor. And given that, given that it is a facial challenge to the statute, it doesn't seem possible or plausible. It's unclear to me, though I admittedly haven't thought carefully about it, how one would even separate the cases. Turning to the merits, plaintiffs argue that the act's very existence discriminates against all people with terminal illnesses by affording them an additional choice. And that claim rests on the premise that this incredibly personal decision is always invalid. And that is the problem fundamentally with their facial challenge, because the act, as a matter of law, does not deprive anyone of anything or force anyone to do anything. Suicide prevention services are available to all terminally ill people who want them. So any discrimination would have to involve coercive or involuntary measures that are imposed on—they're not imposed on terminally ill people. And it is perfectly appropriate, and it is not discriminatory nor legally improper, for the state not to coerce or involuntarily insist on suicide prevention services for people who are at the very ends of their lives. If there are no further questions, the state defendants would submit on the papers. No questions? No? I think we've got it. Thank you, Counsel. Thank you, Your Honors. Thank you, Your Honors. May it please the Court. We're not disavowing anything that we said in the reply about how facial challenges work. We're following the teaching of this Court in Isaacson, which was the 20-week abortion ban case in Arizona, that said the distinction between facial and as-applied challenges is not so well-defined that it has some automatic effect, that it must always control the pleadings. And so what we said in the reply is that we've been taught by cases like Citizens United and Isaacson that facial versus as-applied is as much a remedies thing as it is a pleadings thing. And so where this case goes after this Court corrects the district court's errors depends on how the evidence develops. But we're not disclaiming what we said in the reply. As to the question of, you know, Counsel said a person cannot volunteer to be terminally ill. That's precisely the dispute in this case. That's a question of fact. And we have alleged with detail that the way these terminal illness determinations work under physician-assisted suicide laws is that you can make yourself terminally ill by stopping treatment, stopping nutrition, stopping hydration. And there are doctors in all 11 states, including California, that are happy to find you terminally ill when you do that and prescribe poison for you. That's how it actually works. And the district court erred by simply looking at the words of the statute and saying, no, we're wrong about that on the facts, the facts that are grounded in decades of experience with these laws. Thank you, Your Honors. All right. Thank you to all counsel for your very helpful arguments this morning. The matter will be submitted.
judges: NGUYEN, MENDOZA, UNKNOWN